# Exhibit 1



AlaFile E-Notice

03-CV-2024-900780.00

To:  BOYER ANDREW PHILIP
andrewbr50@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

THE HEALTH CARE AUTHORITY FOR BAPTIST HEALTH ON BEHALF OF BAPTIST SOUT
03-CV-2024-900780.00

The following complaint was FILED on 10/31/2024 1:47:47 PM

Notice Date:      10/31/2024 1:47:47 PM

GINA J. ISHMAN
CIRCUIT COURT CLERK
MONTGOMERY COUNTY, ALABAMA
251 S. LAWRENCE STREET
MONTGOMERY, AL, 36104

334-832-1260

DOCUMENT 74

ELECTRONICALLY FILED
10/31/2024 1:47 PM
03-CV-2024-900780.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
GINA J. ISHMAN, CLERK

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| THE HEALTH CARE AUTHORITY FOR BAPTIST HEALTH ON BEHALF OF BAPTIST MEDICAL CENTER SOUTH, BAPTIST MEDICAL CENTER EAST, and PRATTVILLE BAPTIST HOSPITAL, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTHCARE OF ALABAMA INC., UNITEDHEALTHCARE INSURANCE COMPANY, and FICTIOUS PARTIES A, B, C, D and E, <br><br> Defendants. | Civil Action No.: 03-CV-2024-900780.00 <br><br> **PARTIAL JURY REQUESTED** |

## FIRST AMENDED COMPLAINT

Pursuant to Rule 15(a) of the Alabama Rules of Civil Procedure, Plaintiff The Healthcare Authority for Baptist Health on behalf of its hospitals Baptist Medical Center South, Baptist Medical Center East, and Prattville Baptist Hospital (collectively "Baptist Health" or "Plaintiff") hereby files this First Amended Complaint against UnitedHealthcare Insurance Company and UnitedHealthcare of Alabama, Inc. (collectively, "UnitedHealth" or "Defendants"), showing the Court as follows:

## NATURE OF THE CASE

1. Baptist Health is a not-for-profit health system which operates several hospitals in Alabama, including Baptist Medical Center South, Baptist Medical Center East, and Prattville Baptist Hospital (collectively, "Baptist Health Hospitals"). Baptist Health has a contract with UnitedHealth under which UnitedHealth is required to pay for the medical care that Baptist Health provides to UnitedHealth's members. UnitedHealth is failing this requirement in two respects.

2.      First, and as detailed in Baptist Health's original Complaint filed May 23, 2024, UnitedHealth has engaged in a series of varied, illegal practices designed to circumvent (or outright disregard) its contractual obligations, such as unilaterally removing items from Baptist Health's bills, applying wrong medical standards, withholding authorization for treatment, excluding covered claims, or denying claims that it (the world's largest insurer) disagrees with Baptist Health (a nonprofit healthcare provider) as being medically necessary (the "Original Claims").

3.      Second, UnitedHealth is refusing to pay Baptist Health the legally operative Medicare allowable rate for 340B drugs provided to UnitedHealth's Medicare Advantage members from 2018-2022 (the "340B Claim").

4.      Baptist Medical Center East and Baptist Medical Center South are safety-net hospitals (the "Safety-Net Hospitals"), meaning they care for the nation's most underserved communities (particularly, those of Montgomery County), allowing them to purchase certain drugs at a discount under Section 340B of the Public Health Services Act.   When they provide those drugs to traditional Medicare patients, the Centers for Medicare & Medicaid Services ("CMS") pays the Safety-Net Hospitals a predetermined rate for those drugs under traditional Medicare. When they provide those same drugs to UnitedHealth's Medicare Advantage members, under their contract with UnitedHealth, UnitedHealth is required to pay the Safety-Net Hospitals the exact same rate.

5.      In 2018, CMS illegally reduced the reimbursement rates for drugs purchased under Section 340B. After the Supreme Court of the United States found this reduction was illegal, CMS issued a retroactive Final Rule correcting the rate to its pre-2018 configuration.  Having corrected the prior rate, CMS then paid 340B hospitals (via lump sum) pursuant to the corrected rate.

2

6.    Even though its contractual obligation to Baptist Health is directly tied to the Medicare rate set by CMS, UnitedHealth refuses to pay Baptist Health under the correct rate – asserting it can rely on a rate that was both illegally set (shown by the Supreme Court's ruling) and is now legally null and void (due to CMS' retroactive correction).

7.    Baptist Health's previous efforts to resolve the 340B Claim with UnitedHealth have not been successful and, accordingly, Baptist Health is amending its Complaint to recover – along with the Original Claims – what it is owed.  Baptist Health estimates that UnitedHealth owes it approximately $6,000,000 for the Original Claims and $18,000,000 for the 340B Claim, with interest accruing daily.

## PARTIES

8.    Plaintiff The Healthcare Authority for Baptist Health is an Alabama corporation with its principal place of business in Tuscaloosa County, Alabama. The Healthcare Authority for Baptist Health owns the hospitals Baptist Medical Center South, Baptist Medical Center East, and Prattville Baptist Hospital.

9.    Baptist Medical Center South is a licensed 492-bed, not-for-profit, faith-based acute care regional referral center accredited by the Joint Commission on Accreditation, is a corporation licensed pursuant to the laws of Alabama, and is located in Montgomery, Alabama.

10.    Baptist Medical Center East is a 176-bed acute care hospital specializing in women and children's services accredited by the Joint Commission on Accreditation, is a corporation licensed pursuant to the laws of Alabama, and is located in Montgomery, Alabama.

11.    Prattville Baptist Hospital is a 107-bed acute care community hospital accredited by the Joint Commission on Accreditation, is a corporation licensed pursuant to the laws of Alabama, and is located in Prattville, Alabama.

3

12.     UnitedHealthcare Insurance Company is an Illinois corporation with its principal place of business in Illinois.

13.     UnitedHealthcare of Alabama, Inc. is an Alabama corporation with its principal place of business in Jefferson County, Alabama.

14.     All remaining defendants are pled fictitiously. Said defendants were at the time of the actions alleged herein employees, agents, or servants of Defendant UnitedHealth, and were acting within the scope of that employment, agency, or servant relationship.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction because Baptist Health's principal place of business is in Alabama, UnitedHealthcare of Alabama, Inc.'s principal place of business is in Alabama, and a substantial part of the events and omissions, including Defendants' conduct described in this Complaint, occurred in Alabama.

16.     This Court may exercise jurisdiction over this case pursuant to Ala. Const. art. VI, § 142 and Ala. Code §§ 6-6-222 and 12-11-30(1).

17.     Venue is proper in this Court pursuant to Ala. Code § 6-3-7(a) because a substantial part of the events and omissions upon which this Complaint are predicated occurred in Montgomery County, Alabama, and because the contract which is the subject of this Amended Complaint was performed and breached in this county.

## FACTS

18.     UnitedHealth and Baptist Health entered into Facility Participation Agreements (the "Agreements") effective August 1, 2017, and amended effective July 31, 2019. The Agreements govern this dispute.

4

19.     Under the Agreements, UnitedHealth agreed to pay for healthcare services provided by Baptist Health to UnitedHealth's members pursuant to the applicable contract rates in the Agreements.  The Agreements covered members who are Medicare Advantage ("MA") members and commercial members.

20.     The Agreements contain Medicare Advantage Payment Appendices which set forth the terms under which Baptist Health will provide care to MA members and the terms and rates that UnitedHealth will pay Baptist Health for the services provided to MA members.

21.     The 2017 MA Payment Appendices require UnitedHealth to pay Baptist Health a predetermined percentage of the CMS DRG Payment, which is the same rate that the Medicare program pays Baptist Health for services provided to ordinary Medicare members (i.e., those who are not Medicare Advantage members).  The 2019 MA Payment Appendices also require UnitedHealth to pay Baptist Health a predetermined percentage of the CMS DRG Payment.

22.     The MA Payment Appendices state in part:

Inpatient hospital DRG payments will be paid in accordance with CMS' methodology for calculating these payments applicable to Facility's Medicare business, including, without limitation, (a) the base rate as defined by CMS (including disproportionate share hospital (DSH) and/or capital indirect medical education (IME), if applicable) and outlier payments as calculated by CMS for Facility's Medicare business, to the extent that such payments continue to be utilized in the CMS methodology, and (b) special reimbursement guidelines issued by CMS with respect to expanded coverage regarding certain services.

23.     The MA Payment Appendices further state that "[f]or purposes of determining the contract rate under this Appendix, the DRG at discharge, as that term is defined in the Final Rule, as published by CMS and most recently made effective under this Appendix, shall be controlling."

24.     The MA Payment Appendices define "eligible charges" for payment as "the Customary Charge for Covered Services, except for any Covered Services listed under Sections 3.4 and 3.5 of this Appendix."

25. Section 3.4 lists "Services Always Included Within the Payment for Other Covered Services and Not Eligible for Consideration in Other Calculations for Payment."

26. Section 3.5 lists "Services Not Payable Under This Appendix But May Be Payable Under Another Appendix to this Agreement or Under Another Agreement."

27. None of the charges at issue in this case involve services listed in Sections 3.4 or 3.5 of the MA Appendices.

FACTS RELEVANT TO THE ORIGINAL CLAIMS

## A. UnitedHealth's Line-Item Denials of Charges

28. Baptist Health Hospitals are entitled to set up their charges as they see fit, and no law or regulation requires hospitals to include the costs or charges for certain items or services in the charges for other items or services. For example, a hospital can set up its charges so that its laboratory charges for laboratory tests include the charge for venipuncture (blood draw) or it can set up its charges so that laboratory tests do not include the charge for venipuncture and there is a separate charge for venipuncture. Similarly, a hospital can choose to include the charges for saline solution in the charges for medications that are diluted in saline solution, or it can choose to set up its charges so that there are separate charges for medications and saline solution.

29. The Medicare program does not require hospitals to include the charge for items or services, such as venipuncture or saline solution, in other charges. In fact, Medicare rules provide that hospitals can set up their charges as they see fit as long as they charge all payors in the same manner. Moreover, the CMS does not disallow charges for items or services, such as venipuncture or saline solution, when calculating the DRG payment to hospitals, including for outlier payments.

30. UnitedHealth has begun disallowing charges for certain items and services on Baptist Hospital's bills in order to reduce the amount of outlier payments to Baptist Health for services provided to MA members. UnitedHealth has no justification for disallowing these charges

6

in calculating the payments to Baptist Health and its actions result in Baptist Health receiving less reimbursement that it is entitled to under the Agreements.

31.     Baptist Health estimates that as of the filing of the Original Complaint, the additional principal owed by UnitedHealth related to this issue exceeded $1,200,000. This amount is continuing to increase so long as UnitedHealth continues to improperly deny these charges. This amount does not include the accruing interest Baptist Health is entitled to for these unpaid amounts.

**B. UnitedHealth is Improperly Denying Payment for Treatment at Different Facilities that Occurs Within Three Days of Each Other**

32.     UnitedHealth is improperly applying the CMS 3-day payment window rule to deny payment that is rightfully owed to Hospitals.

33.     When a patient is admitted as an inpatient to a hospital, Medicare regulations require the bundling into the hospital bill and DRG payment of most services furnished within three days of the date of admission by any entity "wholly owned or operated by the hospital." 42 C.F.R. § 412.2(c)(5)(i). CMS has clarified in its regulations and other published guidance that in order for the preadmission services to be subject to the 3-day payment window, the entity furnishing the services must be either "wholly owned"—i.e., the hospital must be the "sole owner"—or "wholly operated"—i.e., the hospital must have "exclusive responsibility" over the entity's routine operations. *See* 42 C.F.R. § 412.2(c)(5)(i) (emphasis added).

34.     Commonly owned or operated entities, however, do not meet this standard. If both the hospital and the entity furnishing preadmission services are owned by a third party, such as a health system, the 3-day payment window does not apply:

> Arrangement: Corporation Z owns Hospitals A and B. If Hospital A performs preadmission services and the patient is subsequently admitted as an inpatient to Hospital B, are the services subject to the payment window?
>
> Policy: No. The payment window does not apply to situations in which both the admitting hospital and the entity that furnishes the preadmission services are owned

7

by a third entity. The payment window includes only those situations in which the entity furnishing the preadmission services is wholly owned or operated by the admitting hospital itself.

*See* 63 Fed. Reg. 6866-67 (Feb. 11, 1998); 76 Fed. Reg. 73026, 73285-86 (Nov. 28, 2011).

35.    In its response to Frequently Asked Questions ("FAQs"), CMS reiterated its position:

> Q.10. When would the 3-day (or 1-day) payment window not apply?
>
> A.10. The 3-day (or 1 day) payment window does not apply in the circumstances described below:
>
>> • If the hospital and the physician office or other Part B entity are both owned by a third party, such as a health system; and
>> • If the hospital is not the sole or 100 percent owner of the entity, for example, if the hospital has a financial or administrative partner, or if physicians or other practitioners have an ownership interest in the hospital, physician practice or Part B entity. ...

*See* CMS FAQs on the 3-Day Payment Window for Services Provided to Outpatients Who Later Are Admitted as Inpatients (Dec. 3, 2020).

36.    UnitedHealth is using the 3-day payment window rule to improperly deny payment for Baptist Health's services where the outpatient services received by the patient within the 3-day window were provided by a different facility that is not wholly owned or operated by the hospital. Commonly owned entities, as in the case where multiple facilities are both owned by a health system, do not share a relationship that implicates the 3-day payment window. Here, The Healthcare Authority for Baptist Health owns the hospitals at issue, but each facility is distinct from each other from and does not share an ownership interest in the other. This is like the "Corporation Z" scenario described above.

37.    Moreover, it is often the case that the services provided by a facility within 3-days of each other include non-diagnostic services clinically distinct or independent from the reason for

8

the beneficiary's admission. The 3-day payment window policy applies only to diagnostic services provided during the payment window that are clinically related to the inpatient admission. Where Baptist Health provides non-diagnostic services to a patient at the same facility within the three-day window, Baptist Health bills the services with condition code 51 to denote that the services are distinct and must be paid separately, but UnitedHealth nevertheless denies the services.

38. UnitedHealth has acknowledged that Baptist Health is correct on these issues and overturned these improper denials on many occasions. However, UnitedHealth continues to make these denials without basis, refuses to correct this systemic denial practice, and owes Baptist Health significant amounts for outstanding improperly denied claims.

39. Baptist Health estimates that as of filing the original Complaint, the principal owed by UnitedHealth related to this issue exceeded $15,000. This does not include the accruing interest Baptist Health is entitled to for these unpaid amounts. Baptist Health seeks payment for improperly denied claims and prompt corrective action by UnitedHealth to cease these improper denials.

**C. UnitedHealth is Improperly Downcoding DRGs as a Mechanism to Reduce Payment**

40. Baptist Health is informed and believes that UnitedHealth is improperly downcoding DRGs on Baptist Health Hospitals' bills by misreading the medical records or ignoring parts of the medical records, and improperly substituting its own coding of the bills in order to reduce payments to the Baptist Health Hospitals.

41. Section 2.2 of the Medicare Payor Appendix provides:

> United will group each claim to a DRG based on the coding information provided on the claim. The contract rate is determined by applying the base rate as defined by CMS in effect for the date of discharge, the final DRG (as determined by United from the coding information) and the relative weight in effect under this Appendix as of the date of service (except for the time period between CMS' update and the United update, where it will be based on the date the claim is processed).

9

42.    As the Agreements indicate, the DRG payment is based on the coding information "provided on the claim." It does not give UnitedHealth the right to unilaterally and subjectively change the coding information on the claim to reduce payment owed. And this is exactly what UnitedHealth is doing. Not only are UnitedHealth's actions precluded by the Agreements, but UnitedHealth's unilateral changes to the diagnosis codes for the purpose of reducing DRG payments owed are not supported by the medical record and are often performed by unqualified medical personnel.

43.    Baptist Health estimates that as of filing the original Complaint, the additional principal owed by UnitedHealth related to this issue was $824,000. This does not include the accruing interest Baptist Health is entitled to for these unpaid amounts.

## D. UnitedHealth is Improperly Applying a Sepsis-3 Standard Rather Than the Sepsis-2 Standard Used by Medicare

44.    The MA Regulatory Appendix requires both UnitedHealth and Baptist Health to follow Medicare rules, definitions and coding in billing and payment for MA patients. For example, the MA Appendices provide: "Inpatient hospital DRG payments will be paid in accordance with CMS's methodology for calculating these payments applicable to Facilities' Medicare business, …"

45.    The Medicare program applies a Sepsis-2 standard, which bases the initial recognition of sepsis on the presence of Systemic Inflammatory Response Syndrome (SIRS) in conjunction with signs of infection, and therefore allows clinicians to consider a sepsis diagnosis much earlier in the disease's progress.

46.    In order to save money, UnitedHealth is applying the Sepsis-3 standard, which is less sensitive than the Sepsis-2 definition and fails to identify patients who are at a significant risk for mortality. CMS has rejected the Sepsis-3 definition because it does clearly identify patients in

10

the early stages of sepsis. CMS requires providers to initiate treatment when sepsis is suspected based on the Sepsis-2 definition and requires providers to submit data on provider adherence to an evidence-based sepsis treatment based on the Sepsis-2 definition. UnitedHealth is therefore applying a lower standard of care to MA patients than is provided to Medicare Fee-For-Services patients. This is prohibited by the Medicare rules and the Agreements.

47.    Moreover, the Sepsis-3 definition is inconsistent with the ICD-10-CM Official Guidelines for Coding and Reporting. These coding guidelines clearly distinguish between sepsis with organ dysfunction and sepsis without organ dysfunction. If Baptist Health Hospitals were to start reporting only cases of sepsis with organ dysfunction and no cases of sepsis without organ dysfunction, it will disrupt all processes related to coding, reimbursement and oversight of sepsis.

48.    Finally, to the extent that payment under the Agreements is based on the DRG that Medicare would apply to the claim, the use of the Sepsis-3 definition, rather than the Sepsis-2 definition, violates the terms of the Agreements and improperly results in lower reimbursement to the Baptist Health Hospitals.

**E. UnitedHealth is Improperly Applying Cost-Share Reductions to Reduce Payment to Baptist Health for Dual Eligible Members**

49.    Section 2.1 of the Medicare Payor Appendix requires that payment be made as follows: "For Covered Services rendered by Facility to a Medicare Customer, Facility shall be paid by Payer the lesser of (1) Facility's Eligible Charges, less any applicable Customer Expenses, or (2) the contract rates set forth in Section 2.2, 2.3 or 3 of this Appendix, less any applicable Customer Expenses."

50.    Section I of the Medicare Payor Appendix defines "Customer Expenses" as "Copayments, deductibles, or coinsurance that are the financial responsibility of the Medicare Customer according to the Medicare Customer's Benefit Plan."

11

51. However, Baptist Health is not permitted to charge dual-eligible members (members covered by both Medicare and Medicaid) for cost shares. 42 C.F.R. § 422.504 (g)(1)(iii). This means the Customer Expenses for dual-eligible members is $0. UnitedHealth therefore cannot reduce payment to Baptist Health based on application of a cost share reduction for dual eligible members. UnitedHealth's improper practice of applying the Medicare cost-share reduction to payments for dual eligibility members violates the terms of the Agreements.

52. Baptist Health estimates that as of filing the original Complaint the additional principal owed by UnitedHealth related to this issue was $15,000. This does not include the accruing interest Baptist Health is entitled to for these unpaid amounts.

**F. UnitedHealth is Improperly Denying Accounts for Lack of Authorization**

53. Section 6.5 of the Agreements sets forth various circumstance where UnitedHealth must pay claims even when authorization was not received. This includes circumstances where (1) the hospital followed UnitedHealth's protocols; (2) the services were medically necessary; or (3) at the time of services hospital "did not know and was unable to reasonably determine that the patient was a Customer, Facility took reasonable steps to learn that the patient was a Customer, and Facility promptly submitted a claim after learning the patient was a Customer."

54. UnitedHealth regularly breaches the Agreements by failing to pay claims on the basis that the services were not authorized but the Agreements nevertheless prescribe payment. This includes situations such as:

- Baptist Health sought prior authorization for the services, was told that no prior-authorization was required, and then UnitedHealth denied payment for the services for lack of prior authorization.

- The physician sought prior authorization for a specific service, but during the course of the procedure determined that a different procedure had to be done for medically necessary reasons;

- Baptist Health did not know that the patient was a UnitedHealth customer

12

at the time of service and promptly submitted a claim to UnitedHealth after learning that the patient was a UnitedHealth customer;

- UnitedHealth denied authorization for the services, but the services were, in fact, medically necessary in accordance with Section 6.5.vii. of the Agreements;

- UnitedHealth denied inpatient authorization for the services despite the physician documenting that they expected the patient to remain at the hospital for at least two midnights.

55.     Baptist Health estimates that as of filing the original Complaint, the additional principal owed by UnitedHealth related to UnitedHealth's improper denials based on authorization exceeded $2.7 million.  This does not include the accruing interest Baptist Health is entitled to for these unpaid amounts.

## G. UnitedHealth is Improperly Denying Payment for Medically Necessary Services

56.     Section 6.5.i.b. of the Agreements require UnitedHealth to pay Baptist Health for Medically Necessary services provided to UnitedHealth's members – even in circumstances where UnitedHealth's policies were not followed.

57.     The Agreement defines medically necessary services as follows:

"Medically Necessary - health care services provided for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms in a manner that is a) in accordance with Generally Accepted Standards of Medical Practice; b) most appropriate in terms of type, frequency, extent, site, and duration; and c) not primarily for the convenience of the patient, physician, or other health care provider.

Generally Accepted Standards of Medical Practice are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.

If no credible scientific evidence is available, then standards that are based on physician specialty society recommendations or professional standards of care may be considered. United reserves the right to consult expert opinion in determining whether health care services are Medically Necessary.

13

58.     UnitedHealth regularly disregards this definition of Medical Necessity and/or fails to acknowledge or recognize Generally Accepted Standards of Medical Practice in making its medical necessity determinations.

59.     Baptist Health estimates that as of filing the original Complaint, the additional principal owed by UnitedHealth related to its failure to properly apply the definition of Medical Necessity exceeded $400,000. This does not include the accruing interest Baptist Health is entitled to for these unpaid amounts.

## H. UnitedHealth is Requesting Medical Records Without Basis, Failing to Recognize Medical Records Provided, and Using These Requests to Delay and/or Deny Payment

60.     UnitedHealth is improperly delaying payment to Baptist Health by requesting medical records prior to payment of claims where there is no basis or reason for the requests. Section 5.5 of the Agreements require UnitedHealth to comply with prompt payment laws.

61.     The Medicare regulations require MA plans like UnitedHealth to pay 95% of clean claims within 30 days of receipt of the claims. 42 C.F.R. § 422.520. The claims submitted by Baptist Health to UnitedHealth were clean claims.

62.     Even when Baptist Health provides the requested medical records, UnitedHealth will often make another request for the medical records and sometimes deny payment for a claim on the alleged basis that records were not received when, in fact, the records were sent, or the time period provided by statute for providing the records (which UnitedHealth had no basis to request in the first place), had not yet run.

63.     In some cases, UnitedHealth fails to allow Baptist Health the contractually agreed 120-days to provide the additional requested information before denying the claims. *See* Agreements Section 6.3.

14

64.    By needlessly requesting medical records on clean claims, and thereby improperly delaying payment on the claims, UnitedHealth is violating the Agreements. Exacerbating matters further, in those situations where UnitedHealth does finally pay the claim, it does not include the statutory interest required.

65.    UnitedHealth's harassing tactics of over-requesting medical records and delaying payment based on medical record requests must cease immediately. Moreover, UnitedHealth must pay statutory interest for claims where it failed to timely pay the claim based on an improper request for medical records. Baptist Health has provided UnitedHealth a list of example claims where UnitedHealth's unnecessary medical record requests have delayed and/or prevented payment. As of filing the original Complaint, Baptist Health estimated UnitedHealth owed it $150,000, exclusive of interest, in connection with this issue.

## I.    UnitedHealth is Failing to Timely Pay Amounts Ordered by the IRO, Failing to Include Interest on the Payments, and Sometimes Recouping Amounts That Were Paid Pursuant to IRO Decision

66.    UnitedHealth is further breaching the Agreements by failing to pay for claims by improperly alleging that the services provided by Baptist Health were not medically necessary, forcing Baptist Health to appeal the denials, forcing Baptist Health to go through the Independent Review Organization ("IRO") process, failing to timely pay the amounts determined by the IRO, failing to pay interest owed on the claims, and, in some instances, recouping the amounts that were paid pursuant to an IRO decision. By way of example, for patient H.G. with dates of service in August 2022, UnitedHealth improperly denied payment for the claim. Baptist Health appealed to the agreed upon IRO, the IRO overturned the denial, UnitedHealth paid the claim, but then later recouped the amount that was paid per the IRO decision. There is no reasonable justification for UnitedHealth's recoupment of the amounts paid which were paid in accordance with the agreed upon IRO process.

15

67.    Exhibit A to the Independent Medical Review Services Agreement requires UnitedHealth to pay claims within 45 days of an IRO decision. In many other cases, after an IRO decision in Baptist Health's favor, UnitedHealth delays payment on the claim for several months (in some cases up to six months).  When UnitedHealth finally does pay the claim, it fails to include the statutory required interest.

68.    Baptist Health estimates that as of filing the original Complaint, the principal outstanding amounts owed for claims where the IRO decided in Baptist Health's favor which were not paid exceeded $85,000.

**J.  UnitedHealth is Failing to Timely Pay Clean Claims Even Where No Information is Requested**

69.    UnitedHealth is improperly delaying payment on clean claims where nothing is requested and fails to include interest on these late-paid claims. For example, the bill for patient M.F. was submitted to UnitedHealth on 4/17/2023. The claim was clean, no information was requested, and UnitedHealth did not pay the claim until 7/3/2023 – 77 days after billing.  No interest was included on this late-paid claim.

**K.  UnitedHealth is Improperly Excluding Certain Claims from the Agreements**

70.    A stated purpose of the Agreements is that: "United wishes to arrange to make Facility's services available to Customers," and "Facility wishes to provide those services, under the terms and conditions set forth in this Agreement."

71.    "'Customer' is defined as a "person enrolled in a 'Benefits Plan.'"

72.    Section 1.1 of the Agreements defines Benefit Plan as follows:

Benefit Plan means a certificate of coverage, summary plan description, or other document or agreement for commercial health plans offered by United, for Employer Sponsored Group Health Plans administered by United and for Medicare Advantage Plans offered by United and as described in Appendix 2.

73.    The All Payer Appendix provides:

16

APPLICABILITY: Unless another appendix to this Agreement applies specifically to a particular Benefit Plan as it covers a particular Customer, the provisions of this Appendix apply to Covered Services rendered by Facility to Customers covered by Benefit Plans sponsored, issued or administered by all Payers.

74.    Appendix 2 sets forth what Benefit Plans are included and excluded from the Agreements:

United will allow Payers to access Facility's services under this Agreement for the Benefit Plan types described in each line item below:

- Benefit Plans where Customers are offered a network of participating providers and must select a primary physician. Such Benefit Plans may or may not include an out-of-network benefit. Facility's services for any such Benefit Plans will always be in-network benefit and Facility shall be classified as in-network provider.

- Benefit Plans where Customers are offered a network of participating providers but are not required to select a primary physician. Facility's services for any such Benefit Plans will always be in-network benefit and Facility shall be classified as in-network provider.

- Medicare Advantage Benefit Plans.

Section 2. Notwithstanding the above section 1 of this Appendix 2, this Agreement will not apply to the Benefit Plan types described in the following line items:

- Benefit Plans where Customers are not offered a network of participating providers from which they may receive Covered Services.

- Medicare and Medicaid Enrollees (MME) Benefit Plans.

- Medicaid Benefit Plans.

- CHIP Benefit Plans.

- Medicare Advantage Private Fee-For-Service Benefit Plans and Medicare Advantage Medical Savings Account Benefit Plans.

- Benefit Plans for workers' compensation benefit programs.

- Other Governmental Benefit Plans.

- TRICARE Benefit Plans.

75.    The Agreements do not exclude any other type of Benefit Plans, insurance products, or lines of business of UnitedHealth, nor do the Agreements place geographical limitations on the scope of the Agreements.

76.    UnitedHealth is improperly excluding certain claims from the Agreements by asserting those claims are not covered by the Agreements even though the claims are for Benefit Plans that are covered, and not excluded, under the Agreements. Baptist Health is informed and believes that UnitedHealth is denying claims on the grounds that Baptist Health is out-of-network for certain insurance plans and that there are no out-of-network benefits for those plans.

**L. Other Improper Actions and Denials**

77.    Baptist Health is informed and believes that UnitedHealth is improperly denying and delaying payment for other reasons that are currently unknown to Baptist Health and not described above. Consistent with the Alabama Rules of Civil Procedure, Baptist Health reserves the right to again amend this First Amended Complaint when it discovers the reasons for those other denials and/or delays in payment.

78.    Finally, not only are UnitedHealth's improper payment tactics in violation of the Agreements and applicable law, they are oppressive to Baptist Health who is forced to spend an absorbent amount of time tracking these issues, appealing to UnitedHealth for payment for which there was no reasonable basis for denial in the first place, tracking when the payment finally comes in (if ever), and having to then watch for possible recoupment even for claims where UnitedHealth was ordered to pay and did pay. The strain on Baptist Health's resources that it takes to get paid by UnitedHealth for the medically necessary services rendered to UnitedHealth's members is appalling and cannot continue. It is these types of tactics that are running hospital systems ragged and putting hospitals out of business.

18

## FACTS RELEVANT TO THE 340B CLAIM

### A. Contract Provisions Relevant to the 340B Claim

79.     The MA Payment Appendices provide that outpatient healthcare services, including provision of 340B-acquired drugs, "shall be paid according to CMS rules governing the hospital Outpatient Prospective Payment System" at a rate that is a percentage of the Medicare allowable rate set by CMS.

80.     From January 1, 2018, through July 30, 2019, UnitedHealth agreed to pay Baptist Health a predetermined percentage of the Medicare allowable rate for 340B-acquired drugs.

81.     This rate was amended by the parties, effective July 31, 2019, to a similar predetermined percentage of CMS' Medicare allowable rate.

82.     The MA Payment Appendices further provide that:

**The above payments will be paid in accordance with CMS' methodology for calculating APC payments applicable to Facility's Medicare business**, including, without limitation, (a) the base rate as defined by CMS and outlier payments as calculated by CMS for Facility's Medicare business, to the extent that such payments continue to be utilized in the CMS methodology, and (b) special reimbursement guidelines issued by CMS with respect to expanded coverage regarding certain services. **In the event CMS makes any modification to the calculation of APC payments for Facility's Medicare business, the methodology and factors relating to such APC payments will be updated by United on or before the later of (a) ninety (90) days after the effective date of such modification**; provided, however, in the event CMS makes a change to such modification after the effective date of such modification, United will update the methodology and factors in accordance with such subsequent change in the public domain, or (b) **ninety (90) days after the date on which CMS places information regarding such modification in the public domain (e.g., CMS distributes program memoranda to hospitals).**

(Emphasis added.)

### B. The 340B Drug Discount Program

83.     Section 340B of the Public Health Service Act requires pharmaceutical manufacturers participating in Medicaid to sell certain outpatient drugs at discounted prices to

19

covered entities that qualify as 340B providers because they care for many uninsured and low-income patients. 42 U.S.C. § 256b. This is known as the "340B Drug Discount Program."

84.    Section 340B(a)(4) specifies which covered entities are eligible to participate in the 340B Drug Discount Program. They include qualifying safety-net hospitals that primarily serve the poor, indigent, or the under- or un-insured. *See* 42 U.S.C. § 256b(a)(4).

85.    The Safety-Net Hospitals are covered entities for purposes of the 340B Drug Discount Program.

## C.  Medicare Payments for Outpatient Drugs

86.    Medicare is a federal health insurance program for eligible disabled individuals and senior citizens. 42 U.S.C. §§ 1395 *et seq*. The Safety-Hospitals participate in the Medicare program and provide hospital services to individuals who qualify for reimbursement through Medicare.

87.    The Medicare hospital Outpatient Prospective Payment System ("OPPS") governs how Medicare is to pay for services offered in hospital outpatient departments, including at the Safety-Net Hospitals. *See* 42 U.S.C. § 1395*l*.

88.    The Medicare Act sets out a formula that CMS must employ annually to set reimbursement rates for certain outpatient drugs provided by hospitals, including the Safety-Net Hospitals, to Medicare patients. 42 U.S.C. § 1395*l*(t)(14). CMS has two options under the statute:

- If CMS has conducted a survey of hospitals' acquisition costs for the drugs, CMS may set the reimbursement rates based on the hospitals' average acquisition costs and may vary the reimbursement rates for different groups of hospitals, 42 U.S.C. § 1395*l*(t)(14)(A)(iii)(I) (the "Acquisition Cost Option"); or

- If CMS has not conducted such a survey, CMS must instead set the reimbursement rates based on the average sales price ("ASP") charged by manufacturers for the drugs (with certain adjustments), and CMS may not vary the reimbursement rates for different hospitals, 42 U.S.C. § 1395*l*(t)(14)(A)(iii)(II) (the "ASP Option").

20

89.     Prior to 2018, CMS consistently selected the ASP Option and adjusted the rate for outpatient drugs to ASP plus 6%.  42 U.S.C. § 1395w-3a(b)(1)(A)-(B).  CMS used this same reimbursement rate for outpatient drugs provided by all hospitals, including 340B hospitals.

90.     Effective January 1, 2018, however, CMS altered the reimbursement rate for outpatient drugs provided by 340B hospitals by adopting a third methodology not authorized by the Medicare Act.  *See* 82 Fed. Reg. 59353 (CY 2018 OPPS Final Rule).  CMS did not conduct a survey of hospitals' acquisition costs for outpatient drugs as required under the Acquisition Cost Option but still reduced the reimbursement rate for 340B hospitals to ASP minus 22.5%.  *Id.*

91.     This change effectively eliminated the benefit of the 340B Drug Discount Program for covered entities like the Safety-Net Hospitals.

92.     For 2019, CMS set the reimbursement rate for outpatient drugs provided by 340B hospitals in the same way (i.e., ASP minus 22.5%).  CMS again did not conduct a survey of hospitals' acquisition costs.

**D.  The Supreme Court Holds 340B Hospitals Cannot Be Paid Differently**

93.     The American Hospital Association and healthcare providers filed suit in federal court to challenge CMS's 2018 and 2019 reimbursement rate for outpatient drugs provided by 340B hospitals.

94.     In June 2022, the United States Supreme Court unanimously held that CMS unlawfully reduced reimbursement for 340B hospitals in 2018 and 2019 by changing the OPPS to ASP minus 22.5%.  *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022).  The Court concluded that absent a survey of hospitals' acquisition costs, CMS may not treat 340B hospitals differently than non-340B hospitals such as by lowering their reimbursement for outpatient drugs.  *Id.* at 739.

95.     The Supreme Court's decision was made in the context of reviewing CMS's reimbursement rate for 2018 and 2019; however, the Supreme Court's conclusion that CMS's

21

outpatient drug rate for 340B hospitals was "contrary to statute and unlawful" is equally applicable to subsequent years. This is true for the portion of 2022 when Medicare reimbursement for 340B drugs continued to be ASP minus 22.5%.

96. On remand, the United States District Court for the District of Columbia ("DC District Court") vacated CMS's 2022 OPPS Final Rule prospectively. Specifically, the DC District Court vacated the ASP minus 22.5% payment rate in the Medicare OPPS system for all 340B drugs for periods on or after September 28, 2022, and explained that the reimbursement rate would revert to the default rate under the Medicare statute (ASP plus 6%) on a go-forward basis. *Am. Hosp. Ass'n v. Becerra*, No. 18-cv-2084, 2022 WL 4534617 at *5 (D.D.C. Sept. 28, 2022).

97. Regarding underpayments from January 1, 2018, to September 27, 2022, the DC District Court remanded to CMS to develop a solution for the historical underpayments. *Am. Hosp. Ass'n v. Becerra*, No. 18-cv-2084, 2023 WL 143337 at *1 (D.D.C. Jan. 10, 2023).

98. On November 7, 2023, CMS published a final rule outlining the remedy for underpaid 340B drugs for dates of service from January 1, 2018, to September 27, 2022. The rule retroactively modified the prior rate, and as a result CMS provided affected covered entities with a lump sum payment intended to pay the difference between what the hospital should have been paid and what the hospital was paid based on claims data submitted between 2018 and 2022.

99. CMS was clear that the lump sum payment was not a standalone adjustment to the hospital's aggregate payment amount; instead, it was the result of an adjustment of the prior rate to the statutory default (ASP plus 6%). 88 Fed. Reg. at 77158, 77174 (stating "this final rule can be reviewed as a retroactive adjustment to the payment rates for each of 2018 through 2022").

**E. UnitedHealth Fails to Correct Its Underpayment for 340B Drugs**

100. At all times relevant to this dispute, the Agreements required UnitedHealth to pay for outpatient covered services, including outpatient drugs acquired pursuant to the 340B program, at a percentage of the Medicare allowable rate under the OPPS.

101. From January 1, 2018, to December 1, 2022, UnitedHealth paid Baptist Health for 340B-acquired drugs using a methodology that was based on Medicare rate of ASP minus 22.5%, which rate was held to be unlawful and was therefore retroactively amended to the statutory default of ASP plus 6%.

102. Accordingly, because UnitedHealth's contractual payment obligation is tied to the Medicare allowable rate, UnitedHealth is obligated to reimburse Baptist Health at the correct Medicare allowable rate, less any payments made pursuant to the prior unlawful rate.

103. Furthermore, because CMS' final rule makes up for the retroactive increase to 340B rates by decreasing all other non-drug rates that that CMS and Medicare Advantage Organizations (like UnitedHealth) will pay in the future, UnitedHealth will receive a windfall in funds earmarked to serve the Safety-Net Hospitals' communities if it is not required to honor its contractual obligations.

104. Baptist Health and UnitedHealth have had ongoing discussions regarding this issue. On April 17, 2024, Baptist Health sent a letter to UnitedHealth seeking to clarify UnitedHealth's position regarding whether it would be making additional payments for claims for 340B drugs provided to UnitedHealth's MA members from 2018-2022.

105. UnitedHealth did not provide a substantive response, and so on May 1, 2024, Baptist Health sent UnitedHealth a Dispute notice pursuant to the Agreements.

106. UnitedHealth again did not provide a substantive response, and so on July 1, 2024, Baptist Health initiated mediation proceedings pursuant to the dispute resolution terms of the Agreements.

107. The parties participated in a mediation on October 10, 2024, which was unsuccessful.

108. As of the date of this First Amended Complaint, UnitedHealth still refuses to correct its underpayments of 340B drugs and reimburse the Safety-Net Hospitals at the operative Medicare allowable rate, which is a breach of the Agreements' requirement that UnitedHealth reimburse the Safety-Net Hospitals at the operative Medicare allowable rate.

109. Baptist Health estimates that from January 1, 2018, to December 1, 2022, UnitedHealth has underpaid the Safety-Net Hospitals by at least $18,000,000, including statutory prejudgment interest.

### SUMMARY

110. UnitedHealth has systematically breached the Agreements, leading to both the Original Claims, which reflect various practices that UnitedHealth has applied on case-by-case bases to keep from paying what it owes, and the 340B Claim, which reflects a ubiquitous disregard for the Agreements themselves.

111. Baptist Health estimates that UnitedHealth owes it at least $6,000,000 for the Original Claims and $18,000,000 for the 340B Claim, with interest accruing daily.

### COUNT I – BREACH OF CONTRACT

112. The allegations in paragraphs 1 through 111 are incorporated by reference as if fully set forth herein.

24

113.   The Agreements are valid, enforceable contracts that are signed by both Baptist Health and UnitedHealth and supported with consideration.

114.   Baptist Health has performed all the terms and conditions of the Agreements, except as prevented by the actions of UnitedHealth.

115.   UnitedHealth has breached the Agreements as alleged above in connection with the Original Claims by:

- improperly line-item denying charges on the claims;

- improperly denying payment for treatment at different facilities that occurs within three days of each other;

- improperly downcoding DRGs as a mechanism to reduce payment;

- improperly applying a Sepsis-3 standard rather than the Sepsis-2 standard used by Medicare;

- improperly applying cost-share reductions to reduce payment for dual eligible members;

- improperly denying accounts for lack of authorization where (1) Baptist Health followed UnitedHealth's protocols, (2) the services were medically necessary, or (3) at the time of services Baptist Health did not know and was unable to reasonably determine that the patient was a Customer, took reasonable steps to learn that the patient was a Customer, and Baptist Health promptly submitted a claim after learning the patient was a Customer;

- improperly denying payment for medically necessary services;

- improperly requesting medical records without basis, failing to recognize medical records provided, and using these requests to delay and/or deny payment;

- failing to timely pay amounts ordered by the IRO, failing to include interest on the payments, and sometimes recouping amounts that were paid pursuant to IRO decision;

- failing to timely pay clean claims even where nothing is requested; and

- improperly excluding certain claims from the Agreements.

116.    As described above in connection with the 340B Claims, following CMS' final rule UnitedHealth breached the Agreements by improperly failing to pay the correct Medicare allowable rate for the 340B-acquired drugs Baptist Health provided to UnitedHealth's MA members.

117.    As a direct and proximate result of UnitedHealth's breaches, Baptist Health has suffered significant harm, monetary loss, and damages, estimated to be approximately $6,000,000 for the Original Claims and $18,000,000 for the 340B Claim.  Baptist Health is also entitled to prejudgment interest at the applicable rate under Ala. Code § 8-8-10, attorneys' fees and costs incurred in seeking to collect this debt, and any and all other relief to which the Court determines Baptist Health is entitled.

## COUNT II - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

118.    The allegations in paragraphs 1 through 117 are incorporated by reference as if fully set forth herein.

119.    UnitedHealth has likewise breached its duty of good faith and fair dealing with respect to the Agreements.

120.    When it entered into the Agreements with UnitedHealth, Baptist Health expected that UnitedHealth would not:

- line-item deny charges on the claims;
- deny payment for treatment at different facilities that occurs within three days of each other;
- downcode DRGs as a mechanism to reduce payment;
- apply a Sepsis-3 standard rather than the Sepsis-2 standard used by Medicare;
- apply cost-share reductions to reduce payment for dual eligible members;

26

- deny accounts for lack of authorization when (1) Baptist Health followed UnitedHealth's protocols; (2) the services were medically necessary; or (3) at the time of services Baptist Health did not know and was unable to reasonably determine that the patient was a Customer, Baptist Health took reasonable steps to learn that the patient was a Customer, and Baptist Health promptly submitted a claim after learning the patient was a Customer";

- deny payment for medically necessary services;

- request medical records without basis, fail to recognize medical records provided, and use these requests to delay and/or deny payment;

- untimely pay amounts ordered by the IRO, fail to include interest on the payments, and sometimes recoup amounts that were paid pursuant to IRO decision;

- untimely pay clean claims even where nothing is requested; and

- exclude certain claims from the Agreements.

121.    Further, when it entered into the Agreements with UnitedHealth, Baptist Health expected that UnitedHealth would reimburse Baptist Health at a percentage of the correct Medicare allowable rate for medical care provided to UnitedHealth's MA members, including provision of 340B-acquired drugs.

122.    Baptist Health reasonably expected UnitedHealth to reimburse Baptist Health for medical care provided to UnitedHealth's commercial and MA members in accordance with the Agreements, the parties' course of dealing, and industry-wide standards.

123.    Alabama law implies into the Agreements a covenant of good faith and fair dealing. *Sellers v. Head*, 73 So. 2d 747, 751 (Ala. 1954) ("Where a contract fails to specify all the duties and obligations intended to be assumed, the law will imply an agreement to do those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made.").

124.    By taking the actions described in Paragraph 120 and by failing to apply the correct Medicare allowable rate and remedy its underpayments following CMS' final rule to "do those

27

things that according to reason and justice [it] should do in order to carry out the purpose for which the [Agreements]" were made, UnitedHealth breached its duty to deal fairly and in good faith with Baptist Health. *Id.*

125.   Baptist Health has performed all the terms and conditions of the Agreements except to the extent the actions, omissions, and inactions of UnitedHealth have frustrated and excused such performance.

126.   As a direct and proximate result of UnitedHealth's breaches of the covenant of good faith and fair dealing, Baptist Health has suffered significant harm, monetary loss, and damages, estimated to be approximately $6,000,000 for the Original Claims and $18,000,000 for the 340B Claim.  Baptist Health is also entitled to prejudgment interest at the applicable rate under Ala. Code § 8-8-10, attorneys' fees and costs incurred in seeking to collect this debt, and any and all other relief to which the Court determines Baptist Health is entitled.

## COUNT III – DECLARATORY RELIEF

127.   The allegations in paragraphs 1 through 126 are incorporated by reference as if fully set forth herein.

128.   Pursuant to Ala. Code § 6-6-220 *et seq.*, an actual and justiciable dispute or controversy exists between Baptist Health and UnitedHealth involving justiciable questions relating to the parties' rights or obligations under the Agreements.

129.   Baptist Health contends that UnitedHealth does not have the right to:

- line-item deny charges on the claims;
- deny payment for treatment at different facilities that occurs within three days of each other;
- downcode DRGs as a mechanism to reduce payment;
- apply a Sepsis-3 standard rather than the Sepsis-2 standard used by Medicare;

28

- apply cost-share reductions to reduce payment for dual eligible members;

- deny accounts for lack of authorization when (1) Baptist Health followed UnitedHealth's protocols; (2) the services were medically necessary; or (3) at the time of services Baptist Health did not know and was unable to reasonably determine that the patient was a Customer, Baptist Health took reasonable steps to learn that the patient was a Customer, and Baptist Health promptly submitted a claim after learning the patient was a Customer";

- deny payment for medically necessary services;

- request medical records without basis, fail to recognize medical records provided, and use these requests to delay and/or deny payment;

- untimely pay amounts ordered by the IRO, fail to include interest on the payments, and sometimes recoup amounts that were paid pursuant to IRO decision;

- untimely pay clean claims even where nothing is requested; and

- exclude certain claims from the Agreements.

130. With respect to the 340B Claim, Baptist Health contends that UnitedHealth must reimburse Baptist Health for the 340B-acquired drugs Baptist Health provided to UnitedHealth's Members from January 1, 2018, to December 1, 2022 pursuant to the corrected Medicare allowable rate.

131. Baptist Health is informed and believes that UnitedHealth disagrees with these contentions.

132. Therefore, with respect to the Original Claims Baptist Health seeks an order declaring that UnitedHealth does not have the right to engage in the practices set forth in paragraph 129 above, and with respect to the 340B Claim seeks an order declaring that UnitedHealth must reimburse Baptist Health for the 340B-acquired drugs Baptist Health provided to UnitedHealth's Members from January 1, 2018, to December 1, 2022 pursuant to the corrected Medicare allowable rate.

29

## JURY TRIAL DEMAND

133.    Pursuant to Alabama Rules of Civil Procedure Rule 38(c), Baptist Health requests a trial by jury for the Original Claims.

134.    Baptist Health does not request a jury trial for the 340B Claim and requests a separate bench trial for the 340B Claim pursuant to Alabama Rules of Civil Procedure Rule 42(b).

## PRAYER FOR RELIEF

WHEREFORE, Baptist Health respectfully requests that this Court:

A.    Award Baptist Health breach of contract damages and a declaratory judgment as described herein with respect to the Original Claims;

B.    Award Baptist Health breach of contract damages, breach of the duty of good faith and fair dealing damages, and a declaratory judgment as described herein with respect to the 340B Claim;

C.    Order a separate and expedited bench trial on the 340B Claim and a later jury trial on the Original Claims;

D.    Award Baptist Health attorneys' fees, interest, and costs incurred in seeking to collect this debt; and

E.    Award Baptist Health such other and further relief as the Court deems just and proper.

Respectfully submitted, this 31st day of October, 2024.

/s/ James E. Williams
James E. Williams (WIL071)
One of the Attorneys for Plaintiff, The
Health Care Authority for Baptist Health on
behalf of its hospitals Baptist Medical

30

Center South, Baptist Medical Center East, and Prattville Baptist Hospital

**OF COUNSEL:**

J. Flynn Mozingo (MOZ003)
C. Mark Bain (BAI060)
MELTON, ESPY & WILLIAMS, P.C.
Post Office Drawer 5130
Montgomery, Alabama 36103-5130
Telephone: (33) 263-6621
Facsimile:  (334) 263-7252
jwilliams@mewlegal.com
fmozingo@mewlegal.com
mbain@mewlegal.com

J. Andrew Pratt (PRA014)
Daron Tooch (*phv*)
James W. Boswell (*phv forthcoming*)
Jennifer S. Lewin (*phv*)
K. Tyler Dysart (*phv*)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309-3521
Telephone:  (404) 572-3576
apratt@kslaw.com
dtooch@kslaw.com
jboswell@kslaw.com
jlewin@kslaw.com
tdysart@kslaw.com

*Counsel for Plaintiff Baptist Health*

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL AS FOLLOWS:**

UnitedHealthCare Insurance Company
C T Corporation System
2 North Jackson Street
Suite 605
Montgomery, Alabama 36104

*JURY REQUESTED ON ORIGINAL CLAIMS BUT NOT THE 340B CLAIM*

31

## CERTIFICATE OF SERVICE

I, the undersigned counsel of record, do hereby certify that I have served a true and correct copy of the foregoing on all counsel of record, as listed below, by electronic filing on this the 31st day of October, 2024.

Andrew Boyer
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7455
andrew.boyer@alston.com

Michael B. Beers
BUTLER SNOW, LLP
250 Commerce Street, Suite 100
Montgomery, Alabama 36104
Telephone: (334) 832-2905
Mike.Beers@butlersnow.com

/s/ *James E. Williams*
James E. Williams
Attorney for Plaintiff